IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

NOV - 1 2018

David J. Bradley, Clerk of Court

UNITED STATES OF AMERICA

v.

Case No. H18 - 1795M

RASIEL GUTIERREZ MORENO        (1)
MILENA DEL CARMEN HERNANDEZ
ORTEGA                          (2)
RAFAEL MENDOZA                  (3)

## CRIMINAL COMPLAINT

I, Special Agent Thomas Schirra, the undersigned Complainant, being duly sworn, states the following is true and correct to the best of my knowledge and belief:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with the U.S. Department of State, Diplomatic Security Service (DSS), currently assigned to the Houston Field Office, Houston, Texas since 2017. Prior, I was Commercial Real Estate Analyst and a Loss Prevention Officer. My duties include conducting criminal investigations involving violations relating to the issuance and use of United States passports, visas, and crimes involving human trafficking. I have received training in investigations and evidence collection, including collection and preservation of electronic evidence, at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I also have training in trafficking of individuals involved in forced labor and commercial sex and have participated in multiple search

warrant executions, arrests of criminals, and have led and assisted on investigations into these crimes and others.

2.  This affidavit sets forth facts, and suggests reasonable inferences from those facts, establishing that there is probable cause to believe Rasiel Gutierrez Moreno (hereingafter **Moreno**), Milena Del Carmen Hernandez Ortega (hereinafter **Ortega**), and Rafael Mendoza (hereinafter **Mendoza)** have each aided and abetted each other in committing the offenses of Sex Trafficking and conspiracy to commit Sex Trafficking under 18 U.S.C. §§ 1591, 1594(c) in the Southern District of Texas.  18 U.S.C. § 1591 states in part, who ever knowingly in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or benefits, financially or by receiving anything of value, from participation in a venture.  18 U.S.C. § 1594(c) states in part, whoever conspires with another to violate section 1591.

3.  The information in this affidavit is based upon my own knowledge, records furnished to me in my official capacity and information provided by other law enforcement officials.  This affidavit does not contain every material fact that I have learned during the course of this investigation, and is intended to show only that there is sufficient probable cause for the criminal complaint.

## PROBABLE CAUSE

4. On October 10, 2018, YMCA International Services sent a referral to the Houston Human Trafficking Task Force (HTTF).  The victim, a female Cuban national (hereinafter referred to as F.C.R.) advised YMCA International Services she entered the United States in or around April 2018.  She agreed to pay **Moreno**, a purported smuggler, for her transportation from Cuba to the United States.  Once she entered the United States, F.C.R. learned she owed **Moreno** more money than they had originally agreed upon.  **Moreno** forced her to work as a an adult entertainer and prostitute to pay off the debt.  **Moreno** threatened F.C.R. with physical harm to gain her complaince.  F.C.R. reported to YMCA International Services that she had escaped to Homestead, Florida.  Since fleeing the Houston area, F.C.R. has received threats of physical harm from **Moreno**.

5. In October 2018, F.C.R. was interviewed by Agents with DSS and Homeland Security Investigations (HSI).  F.C.R. stated in 2016, she received a call from a friend in Cuba and asked if she was interested in going to the United States. After she expressed interest, her friend told her he would put her in touch with a guy in the United States. Approximately a week later, **Moreno** called F.C.R. and told her he was the guy her friend mentioned.

6. **Moreno** asked F.C.R. if she wanted to leave Cuba.  He stated he would charge her for transporting, referring to smuggling[1], her to the United States from Cuba.

---

[1] Currently, Cuban nationals can not apply for a visa to the United States in Cuba; they must apply at a U.S. Embassy or Consulate outside of Cuba.  Countries close to the United States require visas of Cuban nationals.  Many Cuban nationals have resorted to paying smugglers to assist their departure from Cuba and travel to the United States.

**Moreno** stated he would then help get her a job once she was in the United States, but he didn't specify details pertaining to the type of work or pay.

7. F.C.R. heard rumors of working as a dancer and believed it referred to "salsa dancing". She did not know or expect the employment to involve taking off her clothes and dancing or engaging in commercial sex.

8. F.C.R. first physically met **Moreno** in or around 2017, while **Moreno** and his girlfriend **Ortega**, were on vacation in Bayamo Cuba. When F.C.R. met **Moreno**, he told her "I dedicate myself to taking women to the United States," and that he would "provide clothing, a job, and a place to live". **Moreno** said he typically never charged more than $7,000-$8,000 USD to transport someone to the United States.

9. F.C.R. and some friends met with **Moreno** and **Ortega** a second time at Moreno's mother's house. During that visit, **Ortega** gave presents to F.C.R. **Moreno** and **Ortega** then left Cuba. F.C.R. then maintained contact with **Ortega** and/or **Moreno** through April 2018 by phone, email or Facebook Messenger.

10. On or about September 2017, **Moreno** called F.C.R. and advised he had scheduled her transportation trip to the United States. F.C.R. told **Moreno** she could not go because her mother and sister were out of the country and she needed to stay and care for her grandparents. **Moreno** told F.C.R. that **Ortega** was traveling to Cuba and would give her more information when they met. Travel records confirm **Ortega** traveled to Cuba from Houston on October 15, 2017.

11. On or about April 2018, **Moreno** arranged to transport F.C.R. to the United States. He told her "if she fails him, he'll cut her head off in Cuba." **Moreno** also told F.C.R. that if her intention was to come to the United States to be with her boyfriend that **Moreno** needed to know, and her boyfriend needed to pay what she owed **Moreno**. In a later call, **Moreno** intstructed F.C.R. to not tell anyone she was leaving Cuba and that her boyfriend would find out once she arrived in the United States.

12. In April 2018, F.C.R. arrived at Lincoln-Juarez Land Bridge in Laredo, Texas and presented herself to Customs Border Patrol (CBP) personnel and declared asylum. She was then temporarily detained. CBP records confirmed F.C.R. was detained from April 25 - May 29, 2018, at the Laredo Processing Center in Laredo, Texas and then the T Don Hutto Residential Center detention facility in Taylor, Texas.

13. **Mendoza**, an associate of **Moreno**, and **Moreno** picked F.C.R. up from the detention facility and transported her to **Moreno**'s apartment in Houston, Texas.

14. During the drive to Houston, **Moreno** told F.C.R. he had just assisted with transporting two other Cuban national females (hereinafter I.C.B. and Y.B.C.) to the United States approximately a month prior. Border crossing records reveal **Moreno** and Hendry Milanes (hereinafter Milanes) entered the United States in a vehicle through the Laredo, Texas port of entry on February 14, 2018 at 3:07 PM. Border crossing records reveal I.C.B. and Y.B.C. both entered the United States at the Laredo, Texas port of entry pedestrian gate on February 14, 2018 at 3:13 PM.

15. During the car ride to Houston, **Moreno** then told F.C.R. she would have to dance and prostitute herself at Playmates Cabaret[2]. **Moreno** also asked F.C.R. to become his third girlfriend, but F.C.R. refused.

16. Approxaimtely three days after arriving in Houston, **Moreno** told F.C.R. she now owed him $29,000 USD. When she questioned the amount, he told her it cost him $15,000 USD to get her out of Cuba. The cost should be $30,000 USD, but she was getting a $1,000 USD credit since her sister insisted on paying for the immigration attorney to get F.C.R. out of the detention facility.

17. **Moreno** forced F.C.R. to begin working at the club approximately a week after arriving at his apartment. **Moreno** transported F.C.R. to and from work and his apartment; occassionally he would have **Mendoza** drive her.

18. Or or about July 2018, **Moreno** raped F.C.R. while they were alone at the apartment. **Moreno**, physically larger and stronger than F.C.R., told her he needed to "test the merchandise" before forcing himself on her.

19. **Moreno** instructed **Mendoza** to start a notebook for F.C.R. so she could keep track of her debt to **Moreno**. The notebook starts with $29,000 USD and lists subsequent cash payments to **Moreno**.

20. **Moreno** kept track of the debt owed by F.C.R. and other females he employed in a black ledger he stored at the apartment.

21. F.C.R. resided with **Moreno** and **Ortega** in a one bedroom apartment. **Moreno** forced F.C.R. to sleep on the sofa; **Moreno** and **Ortega** slept in the bedroom.

---

[2] Playmates Cabaret, aka Playmates Show Girls Cabaret, is an adult entertainment strip club in Houston, Texas.

**Mendoza** lived at the apartment for approximately a month and slept on an air mattress.

22. At some point after arriving at the apartment, F.C.R. signed a one-page typed lease agreement. I know based on my training, experience, and this investigation, the lease agreement is likely designed so that F.C.R. feels obligated to reside with **Moreno** and **Ortega**, and work in order to pay the stipulate rent. The document stated F.C.R. owed $300 USD a month to reside at the apartment along with **Moreno** and **Ortega**. The document was signed by **Ortega** and F.C.R. She positively identified the apartment complex, and specifically the apartment number, from an unlabeled photograph of the exterior of the apartment complex. DSS Agents conducted database checks which revealed an association between **Moreno** and **Ortega** with the apartment beginning in March 2018. On October 31, 2018, DSS Agents talked to an employee at The Marq on Voss and learned **Moreno** and **Ortega** are currently renting the apartment and moved in around March 2018.

23. **Moreno** used **Mendoza** as his muscle and logistics. **Mendoza** picked F.C.R. up from the club one night and beat her as the result of an argument. F.C.R. told **Moreno** about the incident, **Moreno** said **Mendoza** should have beat her more severly.

24. From approximately June 2018 to September 2018, **Moreno** forced F.C.R. to work as an adult entertainer and engage in commercial sex at Playmates Cabaret and Gol Bar, both located in Houston, Texas. **Moreno** instructed F.C.R. to

charge clients $300 USD for 30 minutes of sex and $600 USD for 60 minutes of sex.

25. **Moreno** routinely threatened to cause physical harm to F.C.R. and/or her family in Cuba if she ever crossed him. She recalled an incident where she was watching the news with **Moreno** and there was a story about an individual who got off after shooting someone. **Moreno** explained to F.C.R. how people in the United States don't go to jail if they have money and said he could shoot her and nothing would happen to him. F.C.R. has seen a handgun at the apartment.

26. While F.C.R. was living and working for **Moreno**, he took all of F.C.R.'s earnings. F.C.R. worked seven days a week. She paid **Moreno** approximately $1,400 USD a week through $700 USD cash installments on Sunday and Wednesday. F.C.R. was only permitted to go out socially once a month and only after working all day and providing **Moreno** with her earnings. F.C.R. estimated she paid **Moreno** $18,000 USD over the four months she was forced to work for him.

27. F.C.R. received $445 USD a month in food stamps. **Moreno** drove F.C.R. to the grocery store and would instruct her on what to buy with her food stamps that would then feed **Moreno**, **Ortega** and F.C.R. at the apartment.

28. In addition to buying all the groceries at the apartment, **Moreno** also forced F.C.R. to pay the electric bill, cook, clean, and pay for her own cellphone. F.C.R. had no privacy. **Moreno** instructed F.C.R. not to waste "his money" on clothing or shoes. He threatened to charge F.C.R. double the cost of those items if she purchased them without his permission.

29. F.C.R. slept very little and started to use cocaine in order to stay awake and "to deal with the pain of the situation." **Moreno** always had a stash of cocaine at the apartment. **Moreno** would also supply F.C.R. with cocaine when he drove her to work. I know based on my training and experience, traffickers will supply their victims with drugs to keep them compliant.

30. F.C.R. had to take sleeping pills in order to go to bed. F.C.R. recalled an incident where she was forced to work from approximately 1300 hours on one day until approximately 1800 hours the following day. She continued to use cocaine to stay awake until one day she threw up blood; she then switched to Red Bull energy drinks to stay awake instead.

31. On or about September or October 2018, F.C.R. found an efficiency apartment to rent away from **Moreno**'s apartment. After she secretly moved, **Moreno** learned about her new apartment and told her he would now keep her on an even tighter leash.

32. While in Houston, F.C.R. had been in telephonic communication with her old boyfriend from Cuba who was residing in Florida. On or around October 2018, F.C.R. detailed some of her issues to her old boyfriend. He then came to Houston and took her to Florida to get her out of the situation.

33. Shortly therafter, **Moreno** began calling F.C.R. and left threatening messages on her cellphone demanding she return to Houston to continue working for him and paying off her debt. During these threats, **Moreno** stated he was not afraid of the police.

34. F.C.R. currently feels like a prisoner in her home because she believes **Moreno** will send people to find her and she is frightened to venture outside.

35. On October 30, 2018, F.C.R. received a phone call from **Moreno** in which he stated he was in Florida and looking for her. Records confirmed **Moreno**'s phone was hitting on cell phone towers in or around Miami, Florida.

36. Based on my knowledge, training, and experience, I know traffickers will use females to help establish credibility and believeability to their propositions when recruiting female victims. I know traffickers use mental abuse, the threat of or actual physical violence, sexual abuse, drug dependency, the threat of arrest or even deportation as a means to control their victims and to establish and maintain a psychological dependency. Traffickers will also seize identification documents, travel papers such as, passports or visas, any credit card or bankcards of their victims as a means to maintain control and compliance. Traffickers will isolate their victims and control their movements and contact with other individuals. Traffickers who place their victims in a debt bondage will maintain some type of physical and/or electronic record of the debt and payments made towards the debt. The records will be maintained somewhere where the trafficker controls access such as their residence and/or vehicle.

## CONCLUSION

37. Based on the foregoing facts and circumstances, I respectfully submit that there is probable cause to believe Rasiel Gutierrez Moreno, Milena Del Carmen Hernandez Ortega, and Rafael Mendoza have each aided and abetted each other

20

in committing the offenses of Sex Trafficking and conspiracy to commit Sex

Trafficking under 18 U.S.C. §§ 1591, 1594(c) in the Southern District of Texas.


Respectfully submitted,

Thomas A. Schirra, Special Agent
United States Department of State
Diplomatic Security Service


Subscribed and sworn before me this __1__ day of November 2018 at __9:29__ a.m/p.m in
Houston, Texas, *and I find probable cause.*

Frances H. Stacy
United States Magistrate Judge